# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FRED BINSCHUS, individually and as )     No. 71752-9-I
Personal Representative of the Estate )
of JULIE ANN BINSCHUS; TONYA )
FENTON; TRISHA WOODS; TAMMY )     DIVISION ONE
MORRIS; JOANN GILLUM, as Personal )
Representative of the Estate of )     PUBLISHED OPINION
GREGORY N. GILLUM; CARLA J. )
LANGE, individually and as Personal )
Representative of the Estate of LEROY )
B. LANG; NICHOLAS LEE LANGE, )
Individually and as Personal )
Representative of the Estate of )
CHESTER M. ROSE; STACY ROSE, )
Individually; RICHARD TRESTON and )
CAROL TRESTON, and the marital )
community thereof; BEN MERCADO; )
and PAMELA RADCLIFFE, individually )
and as Personal Representative of the )
Estate of DAVID RADCLIFFE, )
                          )
           Appellants, )
                           )
      v. )
                           )
STATE OF WASHINGTON, )
DEPARTMENT OF CORRECTIONS; )
SKAGIT EMERGENCY )
COMMUNICATIONS CENTER d/b/a )
"Skagit 911," an interlocal government )
agency; SKAGIT COUNTY, a political )
subdivision of the State of Washington; )
OKANOGAN COUNTY, a political )
subdivision of the State of Washington, )
                           )     FILED: February 23, 2015
           Respondents. )

TRICKEY, J. — On September 2, 2008, Isaac Zamora killed six people and injured several others. Shortly before the tragic incident, Zamora had been incarcerated in Skagit County and Okanogan County Jails for committing non-

violent crimes. At the time of the shooting, Zamora was experiencing a psychotic episode.

The estates of five people Zamora killed, together with four people he injured (collectively Binschus), brought the present lawsuit against Okanagan and Skagit Counties, Skagit Emergency Communications Center (Skagit 911), and Washington State Department of Corrections (DOC), alleging negligence. Binschus claimed, among other things, that, although the counties knew or should have known of Zamora's deteriorating mental illness during his incarceration, they failed to provide a thorough mental evaluation and appropriate treatment for his schizophrenia. The trial court granted Okanogan and Skagit Counties' motions for summary judgment, concluding that the counties owed no duty to the victims and, even if they did, Binschus failed to prove proximate causation.

On appeal, Binschus contends that the trial court erred in granting the counties' motions for summary judgment, arguing that the counties owed a legal duty to protect the victims from Zamora's violent propensities because the counties (1) had a "take charge" relationship with Zamora under §§ 315 and 319 of the Restatement (Second) of Torts (1965) or (2) committed misfeasance under § 302B of the Restatement (Second) of Torts.[1] Binschus additionally argues that the counties' purported breach was the cause in fact of the victims' injuries.

We hold that, with regard to Skagit County, material issues of fact precludes summary judgment on the question of whether §§ 315 and 319 imposed a legal duty upon the counties. We further hold that material issues of fact remain as to

---

[1] Br. of Appellant at 1, 19, 21.

2

whether the alleged breach was the cause in fact of the victims' injuries. We hold, however, that a duty is not established under § 302B. Accordingly, we reverse and remand for additional proceedings.

## FACTS

Zamora "had a long-standing psychiatric disorder that began to emerge when Zamora was in his late-teens, more than a decade before the incident on September 2, 2008."[2] In May 2000, Zamora began experiencing symptoms of insomnia, paranoia, and anger. In 2003, Zamora was involuntarily committed at North Sound Evaluation and Treatment Center, where he endorsed hallucinations and was prescribed an antipsychotic medication that is commonly used for treatment of schizophrenia. According to Binschus's expert psychiatrist, Dr. Csaba Hegyvary, Zamora was not given a proper diagnosis at that time.

### Skagit County Jail

On April 4, 2008, Skagit County police officers responded to Zamora's parents' residence to investigate a 911 hang-up call from the residence. The officers soon discovered that Skagit County District Court had issued warrants for Zamora's arrest. Zamora complained of a sore shoulder when arrested. As a result, the officers transported Zamora to a local hospital to determine whether he was fit for jail. The hospital subsequently released Zamora, who then was transported to Skagit County Jail.

Zamora remained in the Skagit County Jail pending trial and his eventual guilty pleas. On May 15, 2008, the Skagit County Superior Court sentenced him

---

[2] Clerk's Papers (CP) at 2538 (Dr. Csaba Hegyvary's Deposition).

3

to six months of confinement for malicious mischief in the second degree and possession of a controlled substance. The six-month term was to be followed by 12 months of community supervision by DOC. Under the community supervision provision of the judgment and sentence, the trial court ordered "mental health eval/treatment" and "drug evaluation to comply with all treatment recommendation."[3] The trial court did not make any specific findings regarding Zamora's mental health.

Zamora remained in custody and began serving his sentence at the Skagit County Jail. The jail housed Zamora in a jail unit known as "C-Pod."[4] The C-Pod unit is more secure and isolated than other units in the jail. The Skagit County Jail would place a particular class of inmates in the C-Pod unit: inmates who fought with others; who threatened the general population of the jail; who were considered "anti-social;" who had severe behavioral issues; who were in protective custody; and who had mental health issues.[5]

During his time at the jail, Zamora's mother, Dennise Zamora,[6] made several requests to the Skagit County Jail and the county prosecutor, asking that Zamora receive mental health assistance. Dennise made such a request to the jail on April 7, 2008. She informed the Skagit County Jail that Zamora was bipolar, aggressive, and had anger problems. Dennise added that Zamora refused to obtain treatment and medication. She also reported that she and her husband

---

[3] CP at 3499.
[4] CP at 2581.
[5] CP at 2581, 2599.
[6] We refer to Dennise Zamora by her first name for ease of reference. We intend no disrespect.

4

were in fear of Zamora. In response, on April 11, 2008, Stephanie Inslee, a licensed mental health care professional, visited Zamora at the jail. In a document referred to as "Skagit County Jail Multi-Purpose Request Form," Inslee noted:

> Persecutorial thoughts, easily moved into rageful thinking, . . . feels victimized by just about everyone in his world. Some grandiosity about his education / intelligence and his role in the world: to fix the crazy systems, make people treat him better. Very focused on the issue of chronic pain and poor . . . . Reports anxiety . . . sounds like panic attack. He needs something! Recommend beginning Lamictal: He is paranoid about poison and not messing w/ his brain. Can a person in medical please meet with him if meds are approved and address his fears?[7]

Three days later, a physician approved the Lamictal prescription. According to Dr. Hegyvary, Lamictal is prescribed for seizure disorders and commonly used as a mood stabilizer. Lamictal is not an antipsychotic medication.

On April 23, 2008, another mental health counselor, Cindy Maxwell, saw Zamora after he submitted a mental health request. According to the "Skagit County Multi-Purpose Request Form" memorializing that visit, Zamora was refusing to take the Lamictal medication.[8] Zamora told Maxwell, however, that he was only taking the prescription because it helped him sleep. He said that he preferred to refrain from taking any type of mental health medications. In addition, Zamora expressed extreme anger toward his mother for calling the jail. Maxwell noted that Zamora appeared upset, easily angered, and that his speech was rambling. Maxwell recommended that the jail continue to offer Zamora "psych. meds."[9]

---

[7] CP at 3685.
[8] CP at 3687.
[9] CP at 3687.

5

On May 10, 2008, Zamora submitted a request to see a mental health counselor. He reported that he was seeing black dots and white flashes. The request form does not indicate whether jail staff responded to his request.

The only evidence of any violent occurrence involving Zamora was a jail record reporting that another inmate attacked Zamora and was charged with assaulting Zamora. Otherwise, there were reports describing Zamora's insolent demeanor toward jail staff. Most commonly, however, Zamora complained that he was not receiving adequate medical care for his fractured clavicle and protested his placement in the C-Pod unit.

Okanogan County Jail

On May 29, 2008, Skagit County Jail transferred Zamora to the Okanogan County Jail. At the time of Zamora's transfer, Okanogan County Jail was a party to a contract with Skagit County Jail for the housing of Skagit County Jail inmates. During the term of the contract, when a Skagit County Jail inmate was transferred to Okanogan County Jail, Skagit County Jail would prepare a "Skagit County Jail Transport Form," which was usually sent to Okanogan County Jail in advance of the inmate's arrival.[10] The form identified the inmate, provided basic information about the Skagit County charges for which the inmate was serving time, indicated whether the inmate presented a risk of escape or violence, and listed the inmate's release date.

The contract required that Skagit County Jail send all of an inmate's medical records when it transferred an inmate to Okanogan County Jail. However, during

---

[10] CP at 3649.

the term of the contract, Skagit County Jail developed a practice in which it only transmitted records dealing with current problems that the jail deemed pertinent to the inmate's management. When Skagit County Jail transferred Zamora to Okanogan County Jail, it did not send the "Skagit County Multi-Purpose Request Form[s]" that memorialized Zamora's three mental health requests and visits with mental health professionals, as detailed above.[11] One of those forms documented the April 7, 2008 call made by Zamora's mother, requesting that Zamora receive mental health assistance. Skagit County Jail did send a copy of Zamora's medication log, however, which listed the Lamictal prescription. Otherwise, the records that were transferred generally only reported Zamora's clavicle, shoulder and back problems, and his request for pain medication.

When Zamora arrived at Okanogan County Jail, the booking corrections officer asked him a series of questions. Those officers were trained to watch for signs of mental illness or problems. They noted no behavioral issues exhibited by Zamora during the booking process.

Based on Zamora's behavior and information transmitted by Skagit County Jail, Okanogan County Jail classified Zamora as a minimum custody inmate and housed him in "F module," a dormitory style unit for inmates without any special needs or risk factors.[12] The Okanogan County Jail inspection records indicate that Zamora did not display any unusual or inappropriate behavior while incarcerated there.

---

[11] CP at 3146-51.
[12] CP at 3650.

Inmates at Okanogan County Jail can request assistance or voice concern through a "kite" system.[13] Zamora never submitted a kite request asking to see a mental health counselor or expressing any mental health issue or concern. No other inmate submitted a kite request, or any other type of complaint regarding Zamora.

According to the terms of its contract with Skagit County Jail, Okanogan County Jail had the right to refuse an inmate. However, according to Noah Stewart, the chief corrections deputy at the time of Zamora's incarceration, the jail had only refused an inmate on one occasion due to a behavioral issue. Stewart stated that Okanogan County Jail would not have accepted an inmate with a serious psychiatric issue. But knowledge that an inmate saw a mental health professional for a mental health concern would not keep the jail from accepting that inmate. Stewart testified that had Skagit County Jail transferred the missing mental records to Okanogan County Jail, Okanogan County Jail would still have accepted Zamora. The jail would have monitored him and based its decision on whether to continue housing him on his behavior at the jail. Zamora did not exhibit any conduct, or make any statements suggesting that he presented a risk to himself or others or that he had a significant mental health problem.

Zamora submitted two "kites" requesting treatment for his shoulder.[14] Consequently, Kevin Mallory, a physician's assistant at the Okanogan County Jail, performed a "med call" on Zamora on May 30, 2008.[15] During that visit, Mallory

---

[13] CP at 3650
[14] CP at 3700.
[15] CP at 3699, 3700.

reviewed the medication log that Skagit County Jail had sent, along with other Skagit County Jail records relating to Zamora's orthopedic issues. When Mallory noticed on the medication log the prescription for Lamictal, he asked Zamora about it. Zamora replied that he had not been taking it and did not wish to do so.

Zamora's response was consistent with the Skagit County Jail log, which conveyed Zamora's refusal to take the medication. In fact, the only medication Zamora was interested in taking was narcotic pain medication. During Mallory's interaction with Zamora, Zamora did not display any behaviors indicative of a mood disorder or any other mental health problems. Because Mallory believed Zamora was engaged in drug seeking behavior, he only prescribed ibuprofen, and discontinued Zamora's prescription for Lamictal.

Zamora subsequently submitted additional "kites" relating to shoulder pain, nasal congestion, and digestive problems.[16] He did not submit any request regarding mental health care.

Zamora was released from Okanogan County Jail on August 2, 2008.

Skagit County Jail

On August 5, 2008, three days after his release from Okanogan County Jail, Dennise called 911, requesting that police remove Zamora from her residence because he was disrupting the family. The responding officer arrested Zamora at his parents' residence on an outstanding misdemeanor warrant for failing to appear in court. Before leaving the residence, Dennise advised the officer that Zamora

---

[16] CP at 3701.

9

was suffering from an undiagnosed and untreated mental illness and had been for some time. The officer transported Zamora for booking at Skagit County Jail.

While waiting to be booked, Zamora was reportedly pounding on the walls of the holding room. He was nevertheless "changed down with out [sic] incident" and there is no evidence of additional behavioral problems.[17]

Zamora was released on his own recognizance on August 6, 2008.

Zamora never received a full evaluation by a psychologist or psychiatrist at either jail.

Events Post-incarceration

That same day, on August 6, 2008, Zamora arrived by ambulance to a local hospital emergency room, complaining of sudden onset of nausea, vomiting, and diarrhea. Hospital staff noted that he appeared awake and cognizant of his surroundings. Zamora was prescribed an anti-nausea medication and he was released. Zamora did not manifest any symptoms of a mental health crisis.

On August 13, 2008, Skagit County police received a 911 hang-up telephone call from Zamora's parents' home where Zamora was residing. A Skagit County police officer responded to the residence and spoke with Zamora and his mother, both of whom denied making the call. No further action was taken.

On August 18, 2008, a 911 caller reported that someone was riding a motorcycle on state owned property in Alger, Washington. A Skagit County police officer responded and contacted Zamora. The officer told Zamora that he was not permitted to enter that area and that he was trespassing. Shortly after the

---

[17] CP at 3563.

encounter, Zamora was involved in a motor vehicle accident on his parents' property and was injured. As a result, Zamora was taken to a nearby hospital. One of the doctors who examined him concluded that Zamora had adequate decisional capacity to decline care and had no suicidal or homicidal ideations. The doctor further noted that Zamora presented no imminent threat of harm to himself or others. He concluded that there was no basis upon which to contact a designated mental health professional for further evaluation of Zamora and that Zamora did not meet the criteria for detaining for a psychiatric evaluation.

On September 2, 2008, Zamora committed the crimes that are issue.

Procedural History

Following this tragic incident, Zamora pleaded guilty to 18 charges.[18] On November 30, 2009, the trial court imposed a sentence of life without parole for the murder charges and several hundred months for the other charges.

Binschus filed the present action in Snohomish County Superior Court on September 6, 2011.[19] He filed suit against DOC,[20] Skagit 911, Skagit County, and Okanogan County. Binschus alleged negligence on the part of the counties and that the negligence was a proximate cause of the shooting and resulting deaths and injuries to the victims.

Binschus argued the counties owed the victims a duty under two theories. First, Binschus asserted that the counties had a special relationship with Zamora

---

[18] Zamora was found not guilty by reason of insanity on two counts of aggravated murder.
[19] The estate of one of the murdered victims and one of the injured victims are not parties to this lawsuit.
[20] In July and August 2013, each of the plaintiffs entered into a settlement agreement with DOC. The trial court entered stipulated judgments with respect to each plaintiff.

that gave rise to a duty to protect the victims under the Restatement (Second) of Torts §§ 315 and 319. Second, Binschus contended that the counties' actions created a recognizable high degree of risk of harm that constituted misfeasance under the Restatement (Second) of Torts § 302B.[21]

Skagit and Okanogan Counties moved for summary judgment on all claims against them.[22] Okanogan County moved for summary judgment on the theory that it had no duty to third parties injured after Zamora's release based on its alleged failure to identify, diagnose, and treat Zamora's mental illness. Skagit County claimed that it had no duty to control Zamora after his release. Binschus moved for partial summary judgment only on the issue of duty, contending that the public duty doctrine did not apply to bar his claims. The trial court granted the counties' summary judgment motions on the issues of duty and proximate cause.

Binschus appeals.

## ANALYSIS

### Standard of Review

We review a trial court's summary judgment order de novo. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Hertog, ex rel. S.A.H. v. City of Seattle,

---

[21] Binschus also raised a claim of negligence against Skagit County for the actions of Deputy Terry Esskew, arguing that her actions constituted an affirmative act under the Restatement (Second) of Torts § 302B. The trial court found that no duty was imposed under this theory. It additionally ruled that even if such duty had been imposed, it denied Skagit County's summary judgment motion on the issue of proximate cause. Binschus does not make a specific argument as to Deputy Esskew's alleged negligence on appeal and, thus, the court's decision as to Deputy Esskew is not pertinent to this appeal.

[22] Skagit 911 also moved for summary judgment.

138 Wn.2d 265, 275, 979 P.2d 400 (1999) (citing Taggart v. State, 118 Wn.2d 195, 199, 822 P.2d 243 (1992); CR 56(c)).

The court must construe all facts and inferences in the light most favorable to the nonmoving party. Hertog, 138 Wn.2d at 275 (citing Taggart, 118 Wn.2d at 199). "Questions of fact may be determined as a matter of law 'when reasonable minds could reach but one conclusion.'" Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 788, 108 P.3d 1220 (2005) (quoting Hartley v. State, 103 Wn.2d 768, 775, 698 P.2d 77 (1985)).

If the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" summary judgment is proper. Young v. Key Pharms., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

To prevail on a claim of negligence, a party must prove the following elements: (1) existence of a legal duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. Christensen v. Royal Sch. Dist. No. 160, 156 Wn.2d 62, 66, 124 P.3d 283 (2005). In the present case, only duty and causation are at issue.

Duty

It is well settled that the existence of a legal duty owed to the plaintiff is an essential element in any negligence action. Petersen v. State, 100 Wn.2d 421, 425-26, 671 P.2d 230 (1983). Whether a given defendant owes a duty is generally a question of law. Yong Tao v. Heng Bin Li, 140 Wn. App. 825, 833, 166 P.3d 1263, 1268 (2007). "But where duty depends on proof of certain facts, which may be disputed, summary judgment is inappropriate." Sjogren v. Props. of the Pac. N.W., LLC, 118 Wn. App. 144, 148, 75 P.3d 592 (2003).

Binschus contends that pursuant to the Restatement (Second) of Torts §§ 315 and 319, Skagit and Okanogan Counties had a "take charge" relationship with Zamora that gave rise to a duty to guard against the foreseeable dangers posed by Zamora's violent propensities. Specifically, Binschus asserts that the counties had a duty to provide Zamora with a mental health evaluation and treatment because they were aware of his dangerous propensities. For this claim, we hold that Skagit County potentially owed a duty to the victims, and genuine issues of material fact preclude summary judgment.

Generally, "our common law imposes no duty to prevent a third person from causing physical injury to another." Sheikh v. Choe, 156 Wn.2d 441, 448, 128 P.3d 574 (2006). Section 315 of the Restatement (Second) of Torts carves out one exception to this rule:[23]

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

---

[23] This special relation exception also is an exception to the public duty doctrine. Hertog, 138 Wn.2d at 276 (quoting Taggart, 118 Wn.2d at 219 n.4).

> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

The "take charge" relationship, as set forth in the Restatement (Second) of Torts § 319, is one subset of special relationships contemplated in § 315. Accordingly,

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

RESTATEMENT (SECOND) OF TORTS § 319.

Once the "take charge" relationship is established, the actor "'has a duty to take reasonable precautions to protect against reasonably foreseeable dangers posed by the dangerous propensities of [the third party].'" Joyce v. State, Dep't of Corr., 155 Wn.2d 306, 310, 119 P.3d 825 (2005) (emphasis omitted) (quoting Taggart, 118 Wn.2d at 217). Thus, the relevant threshold questions for purposes of §§ 315 and 319 are whether the actor has taken charge of the third party[24] and whether the actor knows or should know of the danger posed by the third party. Bishop v. Miche, 137 Wn.2d 518, 527, 973 P.2d 465 (1999).

At oral argument before this court, Skagit County conceded that while Zamora was in custody at Skagit County Jail, the jail had a "take charge" relationship with him. We accept this concession. Since Petersen first announced that a special relationship exists between a state psychiatrist and his or her patient,

---

[24] To determine whether an actor has taken charge of the third party, there must be a "'definite, established, and continuing relationship between the defendant and the third party.'" Taggart, 118 Wn.2d at 219 (quoting Honcoop v. State, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)); see also Sheikh, 156 Wn.2d at 448-49; Hertog, 138 Wn.2d at 276.

100 Wn.2d at 428, Washington courts have broadened the scope of the "take charge" relationship to exist between correction officers and offenders. See, e.g., Taggart, 118 Wn.2d at 223-24; Hertog, 138 Wn.2d at 281; Bishop, 137 Wn.2d at 531. We consider the first relevant question satisfied as for Skagit and Okanogan Counties.

The next question we examine, therefore, is whether the counties knew or should have known of Zamora's violent propensities. We hold that material questions of fact remain as to whether Skagit County knew or should have known of Zamora's dangerous tendencies. The same, however, is not true for Okanogan County. Evidence in the record indicates that Skagit County was likely aware that Zamora had potentially dangerous and criminal inclinations.

Zamora had an extensive criminal history. By September 2008, he had been arrested 21 times in Skagit County and incarcerated 11 times. Skagit County Jail had a list of Zamora's criminal history at the time of his 2008 incarceration.

In addition, the record evinces that during the years preceding the September 2008 tragedy, Zamora had several encounters with Skagit County police whereby police officers became aware of Zamora's mental illness. On April 27, 2004, Skagit County police responded to Zamora's parents' residence, where Zamora resided, after Zamora called DSHS indicating he was cutting himself. Police officers responded and contacted Dennise, who informed them that Zamora had previously cut himself. After the Skagit County officers were unable to locate Zamora, Dennise contacted them, reporting that Zamora was at her residence, was off his medications, but not harmed and not threatening suicide. The Skagit

16

County police incident report noted: "At this time we are aware that ISAAC ZAMORA does have some mental problems and his mom will be monitoring him."[25] Furthermore, in May 2007, Zamora called Skagit County police, concerned that someone in his house "was out to get him."[26] The police officer who spoke with Zamora believed Zamora was intoxicated and that there was no threat to his well-being.

Additionally, while at the Skagit County Jail, Zamora was incarcerated in the C-Pod unit, known for inmates who had severe behavioral issues and mental health issues, among other things. Dennise also informed the jail and the Skagit County prosecutor that Zamora had severe and untreated mental health issues and requested that he receive mental health treatment. She also made clear that she and her husband were fearful of Zamora. Significantly, when mental health professional Inslee visited Zamora at jail, she submitted a strongly worded statement expressing concern regarding Zamora's mental health, noting his "rageful thinking."[27] Another mental health counselor, Maxwell, later made note of Zamora's erratic and angry temperament and appearance, recommending that Zamora continue taking "psych. meds."[28]

Finally, we note that on September 2, 2008, Zamora's name on the computer screen at the 911 call center was tagged with a 220 alert code, which indicated that Zamora had mental health issues and was unstable.

---

[25] CP at 3551.
[26] CP at 3552.
[27] CP at 3685.
[28] CP at 3687.

17

Given these numerous contacts between Zamora and Skagit County, reasonable minds could conclude that Skagit County was aware of the risk posed by Zamora's violent propensities. Summary judgment in Skagit County's favor was inappropriate.

The record does not indicate that a material question of fact remained as to whether Okanogan County was aware of Zamora's violent disposition. Nothing in the record establishes Okanogan County knew or should have known of Zamora's unstable mental health condition. Therefore, we affirm the trial court's decision to summarily adjudicate the question of duty in favor of Okanogan County.

The counties contend that no duty can be imposed because any "take charge" relationship terminated once the counties released Zamora from custody. But this argument confuses the existence of a duty with the scope of the duty, which is limited by the foreseeability of the danger to the victims. Christen v. Lee, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989) ("The concept of foreseeability limits the scope of the duty owed.").

"Once the theoretical duty exists, the question remains whether the injury was reasonably foreseeable." Joyce, 155 Wn.2d at 315 (citing Taggart, 118 Wn.2d at 217). The plaintiff's harm must be reasonably perceived as within the general field of danger that should have been anticipated. Christen, 113 Wn.2d at 492. "'Foreseeability is normally an issue for the jury, but it will be decided as a matter of law where reasonable minds cannot differ.'" Taggart, 118 Wn.2d at 224 (quoting Christen, 113 Wn.2d at 492). Here, it was within the jury's province to determine whether the injuries to the victims were reasonably foreseeable.

Accordingly, viewing the facts in the light most favorable to Binschus, we conclude that genuine issues of material fact preclude summary judgment on the question of whether Skagit County owed a "take charge" duty to the victims.

Binschus next contends that the counties owed a duty to Zamora's victims because their purportedly improper mental health evaluation and treatment of Zamora "dramatically increased" the risk of harm to the victims.[29] Binschus bases this argument on the Restatement (Second) of Torts § 302B. We find that no such duty is compelled by § 302B.

The Restatement (Second) of Torts § 302B provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." The duty to protect victims against a third party's criminal act may be imposed "'where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct.'" Robb v. City of Seattle, 176 Wn.2d 427, 434, 295 P.3d 212 (2013) (emphasis omitted) (quoting RESTATEMENT § 302B cmt. e).[30]

---

[29] Appellant's Br. at 33.
[30] Comment e provides, in pertinent part:
> There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where . . . **the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.**

RESTATEMENT (SECOND) OF TORTS § 302B (emphasis added).

In Parilla v. King County, we held that § 302B can impose a duty of care against a third party's criminal acts even where no special relationship existed. 138 Wn. App. 427, 439, 157 P.3d 879 (2007); see also § 302B cmt. e. In Parilla, a county bus driver exited a bus on a public street while the engine was running and when a passenger was still on board. Parilla, 138 Wn. App. at 431. When the driver re-entered the bus, he observed the passenger "exhibiting bizarre behavior." Parilla, 138 Wn. App. at 431. The driver again exited the bus with the engine still running. Parilla, 138 Wn. App. at 431. The passenger moved into the driver's seat and drove the bus until it collided with several vehicles. Parilla, 138 Wn. App. at 431. We held that under those circumstances, the driver's affirmative actions created a high degree of risk that a reasonable person would have foreseen and, thus, pursuant to § 302B comment e, the county owed a duty of care to protect the victims of the collision. Parilla, 138 Wn. App. at 438-41.

In Robb, the Supreme Court reaffirmed that "Restatement § 302B may create an independent duty to protect against the criminal acts of a third party where the actor's own affirmative act creates or exposes another to the recognizable high degree of risk of harm." 176 Wn.2d at 429-30. In that case, two police officers initiated a Terry[31] stop of Behre and his companion on suspicion of burglary. Robb, 176 Wn.2d at 430. During the stop, the officers noticed several shotgun shells on the ground but did not question the suspects or pick up the shells. Robb, 176 Wn.2d at 430. The officers released Behre and the other suspect. Robb, 176 Wn.2d at 430. After Behre walked away, he returned to the

---

[31] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

scene to grab the shells and then shot and killed Robb. Robb, 176 Wn.2d at 430. The officers had encountered Behre prior to the shooting and were aware of his strange behavior during the days leading up to the shooting. Robb, 176 Wn.2d at 431. Four days before the shooting, Behre had been transported to Harborview Medical Center for an involuntary mental health assessment and then had been released. Robb, 176 Wn.2d at 431.

Robb's widow sued the city, claiming that the officers owed a duty to Robb under § 302B. Robb, 176 Wn.2d at 429. Our Supreme Court distinguished its case from Parilla, finding that the officer's failure to pick up the shells was an omission, not an affirmative act like that in Parilla. Robb, 176 Wn.2d at 436-38. The court held that a duty may arise under § 302B only where the actor's conduct constitutes misfeasance (an affirmative act), rather than nonfeasance (an omission). Robb, 176 Wn.2d at 439-40. The court explained that an affirmative act—or misfeasance—involves the creation of a new risk of harm to plaintiffs. Robb, 176 Wn.2d at 437. On the other hand, an omission—or nonfeasance— merely makes the risk of harm no worse. Robb, 176 Wn.2d at 437. The court held that the officer's failure to pick up the shotgun shells was an omission, not an affirmative act, which was insufficient to impose a duty under § 302B. Robb, 176 Wn.2d at 430, 437-39.

More recently, in Washburn v. City of Federal Way, the Supreme Court held that a police officer created a new, affirmative risk to a murder victim's safety when the officer improperly served an antiharassment order to the subject of the order while the subject was home alone with the victim. 178 Wn.2d 732, 759-60, 310

21

P.3d 1275 (2013). The court found that the officer knew or should have known that the subject would react violently when he received the order, and knew or should have known that after he served the order, he left the subject home alone with victim. Washburn, 178 Wn.2d at 759-60. Binschus contends that, unlike the nonfeasance committed by the officers in Robb, and similar to the misfeasance in Washburn, here, the counties engaged in misfeasance by increasing the risk of harm when they failed to "properly evaluate and treat" Zamora.[32] Binschus supports this contention by pointing to evidence that two of Skagit County Jail's mental health counselors saw Zamora in connection with his mental health condition but did not offer an appropriate mental health evaluation. As for Okanagan County, Binschus argues that although Mallory saw Zamora, he did not properly evaluate his mental health condition even though he knew that Skagit County Jail had prescribed Binschus with Lamictal. Binschus also points to evidence demonstrating the counties' awareness of Zamora's deteriorating mental health.[33] Binschus references the opinion of Dr. Hegyvary, who testified that had the counties evaluated Zamora, they would have identified his psychosis.

In an effort to bring his claims within the scope of § 302B, Binschus characterizes the counties' conduct as an improper evaluation and treatment, which, he contends, constitutes affirmative acts or misfeasance. But Binschus's attempt to frame the issue in this way is unconvincing because here, there simply

---

[32] Appellant's Br. at 39.
[33] Binschus references the following in support of his argument: Zamora's lengthy criminal record, his past involuntary treatment, his mother's calls for treatment, his status on Skagit County's 911 call center's computer, his housing in the C-Pod at Skagit County Jail, his judgment and sentence, and his behavior in both jails. Appellant's Br. at 37; Appellant's Reply Br. at 25.

were no affirmative acts. Rather, the counties' failure to evaluate Zamora and provide mental health treatment was an omission.

Furthermore, as established in <u>Robb</u>, § 302B only applies if the entity's affirmative act creates a new recognizable high degree of risk of harm to the plaintiffs. Like the officers in <u>Robb</u>, the counties did not create a new risk. Although it is possible that the jail medical staff could have mitigated the risk posed by Zamora's deteriorating mental health, this is not sufficient to justify an imposition of duty under § 302B. And Binschus cites to no evidence demonstrating that the visits or the prescription of Lamictal created a new recognizable risk or exacerbated the risk that already existed. At best, it purports to show that the counties were aware of Zamora's mental health condition or would have been able to identify his condition had they examined him properly. Nevertheless, the evidence does not establish that the counties' failure to evaluate Zamora more thoroughly or provide treatment constitutes an affirmative act or misfeasance. Instead, the counties committed nonfeasance, which does not give rise to liability under § 302B.

<u>Proximate Cause</u>

Binschus contends that summary adjudication of his claims against the counties was improper because a jury could reasonably find that the counties proximately caused the victims' injuries because of their failure to properly evaluate and treat Zamora during his incarceration. We agree.

Proximate cause contains two separate elements: cause in fact and legal causation. <u>Hartley</u>, 103 Wn.2d at 777. Cause in fact, is, in addition to legal

causation, an element of proximate cause. It "refers to 'the physical connection between an act and an injury.'" M.H. v. Corp. of Catholic Archbishop of Seattle, 162 Wn. App. 183, 194, 252 P.3d 914 (2011) (internal quotation marks omitted) (quoting Ang v. Martin, 154 Wn.2d 477, 482, 114 P.3d 637 (2005)). Cause in fact is usually a question for the jury, but it may be decided as a matter of law if the causal connection between the act and the injury is "'so speculative and indirect that reasonable minds could not differ.'" Moore v. Hagge, 158 Wn. App. 137, 148, 241 P.3d 787 (2010) (quoting Doherty v. Mun. of Metro. Seattle, 83 Wn. App. 464, 469, 921 P.2d 1098 (1996)). Causation is speculative "'when, from a consideration of all the facts, it is as likely that it happened from one cause as another.'" Moore, 158 Wn. App. at 148 (internal quotation marks omitted) (quoting Jankelson v. Sisters of Charity of House of Providence in Territory of Wash., 17 Wn.2d 631, 643, 136 P.2d 720 (1943)).

Binschus asserts that the counties' negligent failure to evaluate and treat Zamora's mental illness was the cause in fact of Zamora's psychotic outburst on September 2, 2008. To support this contention, Binschus relies heavily on expert witness Dr. Hegyvary's declaration:

> [H]ad Zamora been subjected to a mental health evaluation been [sic] during his time at either Skagit County Jail or Okanogan County Jail, the examiner would have discovered Mr. Zamora's psychosis and begun the process of formulating a diagnosis. At this point the standard of care required administration of one or more of the antipsychotic medications.[34]

---

[34] CP at 2540-41.

Dr. Hegyvary also opined that for patients suffering with schizophrenia, "[m]ore often than not, skilled persuasion is all that is required."[35] He also stated that the jails could have provided long-acting treatment to Zamora that would have been effective long after his release:

> Mr. Zamora may have had difficulty complying with an oral regimen of antipsychotic medications requiring daily administration, but there are long-acting, injectable medications for use is [sic] these situations. Haloperidol Decanoate is one such antipsychotic commonly used in the treatment of schizophrenia and acute psychotic states. The medication is a long-acting injection given only once every four weeks. Because the medication is administered directly by the psychiatrist, only once per month, compliance can be documented and is virtually assured. The positive, therapeutic effects of the Haloperidol Decanoate last for longer than four weeks, thus, even if an injection was not given at the four-week mark the medication would continue to work to subdue or eliminate psychosis for up to six weeks. Another such medication is Risperdal Consta (risperidone), which is a depot injection administered once every two weeks. It is likely that either of these medications would have been effective in reducing or completely eliminating Mr. Zamora's psychosis, including his hallucinations and delusions.[36]

Dr. Hegyvary also concluded that had either counties provided Zamora with a proper mental health evaluation, a mental health provider would have been able to identify his psychosis and place him on a treatment plan that would include a long-acting antipsychotic medication. Had the counties done so, Dr. Hegyvary opined, Zamora would not have been in a psychotic state on September 2, leading to the victims' tragic deaths and injuries.

---

[35] CP at 2544.
[36] CP at 2544-45.

25

Based on this evidence, we conclude that Binschus has demonstrated that material questions of fact exist that, but for the counties' alleged negligence, Zamora would not have engaged in the violent rampage.[37]

We hold that summary judgment should not have been granted in this case. We reverse the trial court's summary judgment order and remand for further proceedings consistent with this opinion.

Trickey, J

WE CONCUR:

---

[37] Binschus additionally argues that a county official could have sought involuntary treatment for Zamora under the involuntary treatment act (ITA), ch. 71.05 RCW. Binschus did not argue to the trial court that Zamora could have or should have been detained beyond his release date of August 2, 2008, under the ITA. Binschus waives this argument by raising it for the first time on appeal. State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); see also RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."). Thus, we decline to reach its merits.