

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE SEP 2 2 2016

Madsen, C. J.

CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Sept 22, 2016

SUSAN L. CARLSON
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

FRED BINSCHUS, individually and as
Personal Representative of the Estate of
JULIE ANN BINSCHUS; TONYA
FENTON; TRISHA WOODS; TAMMY
MORRIS; JOANN GILLUM, as Personal
Representative of the Estate of GREGORY N.
GILLUM; CARLA J. LANGE, individually
and as Personal Representative of the Estate
of LEROY B. LANGE; NICHOLAS LEE
LANGE, individually; ANDREA ROSE,
individually and as Personal Representative
of the Estate of CHESTER M. ROSE;
STACY ROSE, individually; RICHARD
TRESTON and CAROL TRESTON, and the
marital community thereof; BEN
MERCADO; PAMELA RADCLIFFE,
individually and as Personal Representative
of the Estate of DAVID RADCLIFFE; and
TROY GIDDINGS, individually,

       Respondents,

  v.

STATE OF WASHINGTON,
DEPARTMENT OF CORRECTIONS;
SKAGIT EMERGENCY
COMMUNICATIONS CENTER d/b/a
"Skagit 911," an interlocal government
agency; and OKANOGON COUNTY, a

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 91644-6

En Banc

Filed    SEP 2 2 2016

| political subdivision of the State of Washington, | ) |
| | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SKAGIT COUNTY, a political subdivision of the State of Washington | ) |
| | ) |
| Petitioner. | ) |

OWENS, J. — In 1992, we held that the State could be held liable for crimes committed by parolees if those crimes resulted from the State's negligence in supervising the parolees. *Taggart v. State*, 118 Wn.2d 195, 822 P.2d 243 (1992). Today, plaintiffs ask us to extend *Taggart* and hold that a county jail can be held liable for crimes committed by a former inmate. However, the crimes in this case occurred well after the inmate left that jail—long after the county had the duty (or ability) to supervise the former inmate. Plaintiffs contend that the jail could have prevented the inmate from committing crimes after he was released, but a jail's duty to supervise and control inmates during incarceration does not include a general duty to somehow prevent inmates from committing crimes after they are lawfully released from incarceration. We affirm the trial court's summary judgment order for Skagit County.

FACTS

Isaac Zamora was incarcerated at Skagit County Jail for nonviolent crimes from April 4, 2008, until May 29, 2008, when he was transferred to Okanogan County Corrections Center. Zamora then served the rest of his sentence at Okanogan County Corrections Center and was released on August 2, 2008.[1]

On September 2, 2008, Zamora had a psychotic episode and went on a shooting spree in Skagit County. He ultimately killed six people and injured several others. Some of his victims and their families (plaintiffs) sued a number of parties, including Skagit County. The plaintiffs alleged that Skagit County was liable for Zamora's actions because of its failure to "exercise . . . ordinary and reasonable care" while Zamora was incarcerated in Skagit County Jail several months prior to the shooting. Clerk's Papers (CP) at 3868. The plaintiffs' claims against the other institutions were either settled out of court or dismissed on summary judgment.

Plaintiffs contend that while Zamora was incarcerated in Skagit County Jail from April 4, 2008, until May 29, 2008, the jail failed to fully evaluate and treat Zamora's mental illness. They argue that (1) Skagit County was on notice that Zamora was in need of mental health services, (2) if Zamora had received a thorough mental health evaluation, he would been diagnosed and prescribed treatment,

---

[1] Zamora was briefly detained by Skagit County on August 5, 2008, but was released by a judge on his own recognizance the next day. The plaintiffs do not allege any negligence by the county during that time period.

(3) Zamora might have complied with treatment resulting from that evaluation, and

(4) if Zamora had complied with that treatment, he might not have had the psychotic

break that led to the shooting in September. For the sake of our analysis today, we

will treat those allegations as true.

The trial judge granted summary judgment to Skagit County on the issues of

duty and proximate cause. The trial judge ruled that "[a]ny take charge duty an entity

owes under Restatement (Second) of Torts § 319 [(Am. Law. Inst. 1965)] must be

based on the presumption that the entity can control the actor. In the case of a jail,

this duty would exist only during the period of incarceration." CP at 212. The trial

judge also found that the plaintiffs had not made a showing that Skagit County's

alleged negligence was the proximate cause of Zamora's crimes.

The Court of Appeals reversed. It held that there were material issues of fact as

to whether Skagit County had a legal duty to the victims and whether a breach of that

alleged duty was the proximate cause of the injuries to the victims. *Binschus v. Dep't*

*of Corr.*, 186 Wn. App. 77, 81, 345 P.3d 818 (2015). We granted Skagit County's

petition for review. 184 Wn.2d 1001, 357 P.3d 665 (2015).

## ISSUE

Did the trial court properly grant summary judgment to Skagit County because

the county's duty to control Zamora did not extend to the plaintiffs?

ANALYSIS

We review summary judgment orders de novo. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* "All facts and reasonable inferences are considered in the light most favorable to the nonmoving party." *Id.*

In this case, the trial court granted summary judgment to Skagit County because Skagit County had no duty to prevent Zamora from committing criminal acts after he was lawfully released from its custody. As explained below, we affirm the trial court. Under the *Restatement*, a jail's duty in a take charge relationship is limited to controlling violent inmates during incarceration, not preventing all foreseeable future crimes.

As a general rule, people and institutions are not responsible for preventing a person from physically harming others. *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983). However, there is an exception when "'a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 315 (AM. LAW INST. 1965)). Crucial to our analysis is the nature of that duty: "'to *control* the third person's conduct.'" *Id.* (emphasis added) (quoting RESTATEMENT § 315).

5

One of those special relationships that gives rise to a duty to control the third person's conduct is the relationship between a jail and an inmate. Specifically, the jail-inmate relationship is often a take charge relationship, described in § 319 of the *Restatement*:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

RESTATEMENT § 319. Again, we note the nature of that duty: "to exercise reasonable care *to control the third person* to prevent him from doing harm." *Id.* (emphasis added).

We adopted the *Restatement*'s rule for take charge relationships in *Taggart*, 118 Wn.2d at 219-20. In that case, we held that parole officers have a take charge relationship with parolees. *Id.* at 220. We explained that the take charge duty is fundamentally about control: "When a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others *if not controlled*, the parole officer is under a duty to exercise reasonable care *to control* the parolee and to prevent him or her from doing such harm." *Id.* (emphasis added). We applied the same rule in *Joyce v. Department of Corrections*, 155 Wn.2d 306, 315-16, 119 P.3d 825 (2005), where we held that community corrections officers can have a take charge relationship with offenders when they are responsible for supervising the offenders and ensuring that they are complying with their conditions of release. We held that

liability can be imposed when there is a failure to adequately supervise the probationer. *Id.* at 319.

Importantly, the take charge duty is not without limitation. Throughout our case law, we have consistently reiterated a fundamental limit on duties arising from a take charge relationship: such a duty will be imposed "only upon a showing of a 'definite, established and continuing relationship between the defendant and the third party.'" *Taggart*, 118 Wn.2d at 219 (quoting *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)); *see also Joyce*, 155 Wn.2d at 319-20.

Plaintiffs ask this court to greatly expand the take charge duty described above. Rather than imposing a duty to control a person's conduct, plaintiffs contend that the take charge duty imposes a broad duty to "to use reasonable care to protect against reasonably foreseeable dangers [the offender] posed." Resp'ts' Suppl. Br. at 13, 20. In theory, this could include all reasonably foreseeable dangers, even those that might occur long after the take charge duty has ended. For support, plaintiffs point to language in *Taggart* and *Joyce* where we summarized the duty that results from a take charge relationship. Taken out of context, one could read the individual sentences as imposing such a broad duty. However, a thorough reading of those cases reveals that they did not create such a radical expansion of the take charge duty. The *Restatements* and our case law consistently explain the take charge duty is a duty to

control, and that liability results from negligently failing to control, not failing to protect against all foreseeable dangers.

In *Taggart*, we held that parole officers have a take charge relationship with parolees, despite the fact that they do not have a custodial relationship. 118 Wn.2d at 223. After an in-depth review of the *Restatement* sections, we explained that "[w]hen a parolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others *if not controlled*, the parole officer is under a duty to exercise reasonable care *to control the parolee* and to prevent him or her from doing such harm." *Id.* at 220 (emphasis added). We then explained the particular actions that the parole officers failed to take to control the parolees—one parole officer should have "supervised closely" the parolee, and the other failed to arrest the parolee for violating the conditions of his parole. *Id.* at 224-25.

Plaintiffs point to one particular statement in *Taggart* where we did not emphasize control. We stated, "We conclude that parole officers have a duty to protect others from reasonably foreseeable dangers engendered by parolees' dangerous propensities."[2] *Id.* at 224. However, following that statement, we

---

[2] We also quoted this statement in *Joyce*, but we did not broaden our holding from *Taggart. See* 155 Wn.2d at 316 ("We have answered all of the questions raised by the State about its duty before."). As in *Taggart*, the statement must be read in the context of the opinion, where we again discussed the nature of that duty: "[O]nce the relationship is created, it is the relationship itself which ultimately imposes the duty upon the government, and 'the failure to adequately monitor and report violations, thus *failure to adequately supervise the probationer*,' may result in liability." *Id.* at 319 (emphasis

discussed how we specifically did not want to "exaggerate the degree of control [parole officers] exercise over parolees." *Id.* To the extent that our concluding statement can be taken out of context to mean that the take charge duty to control is a broad duty to prevent all reasonably foreseeable dangers, we now clarify: the take charge duty described in *Restatement* § 319 as a "duty to control" is, indeed, a duty to *control*. We did not previously, and do not today, expand it to a general duty to prevent a person from committing criminal acts in the future.[3] Such an interpretation is contrary to the language and logic of § 319.

The practical implications of imposing such a broad duty on jails are striking. By some estimates, the recidivism rate is well over 50 percent. *See* U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF PRISONERS RELEASED IN 30 STATES IN 2005: PATTERNS FROM 2005 TO 2010 (2014), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf [https://perma.cc/A4QF-84XQ]. Thus, one could argue that in almost any case, it is foreseeable that an inmate may commit another crime after release. Are jails civilly liable for those crimes if they failed to take adequate measures to prevent that

---

added and omitted) (quoting *Bishop v. Miche*, 137 Wn.2d 518, 526, 973 P.2d 465 (1999)).

[3] The dissent criticizes us for focusing on the word "control" in § 319, but we might levy a similar criticism for their refusal to acknowledge the word altogether. Section 319 imposes "a duty to exercise reasonable care to control the third person to prevent him from doing harm." RESTATEMENT § 319. We stand by our conclusion that the concept of "control" must be a part of any § 319 analysis.

foreseeable recidivism? Such an expansive interpretation is not supported by the *Restatement* sections or a thorough reading of our precedent.

Applying the rule from the *Restatement* sections, Skagit County owed a duty to exercise reasonable care to control Zamora to prevent him from doing harm. This duty was owed during the time when Skagit County had a take charge relationship with Zamora. Skagit County owed this duty to anyone who might foreseeably suffer bodily harm resulting *from the failure to control* Zamora. Skagit County did not owe such a duty for harms unrelated to its duty to control Zamora. The trial court correctly held that as a matter of law, the crimes Zamora committed after his lawful release were not a foreseeable consequence of any failure to control Zamora during incarceration. Thus, the trial court correctly granted summary judgment for Skagit County.

This is not to say that jails can never be liable for a former inmate's actions. First, there may be situations in which a jail's failure to control an inmate results in foreseeable injury to others, and the jail may be liable even if that injury occurs after the duty to control ended. For instance, a jail could fail to control a violent inmate by negligently allowing him or her to escape one week before he or she was scheduled to be released. Even if the inmate injured others after the scheduled release date (and thus after the jail's duty to control had theoretically ended), the jail might still be liable if its failure to control the inmate during incarceration was the proximate cause

of the injuries. Such a situation would be analogous to *Petersen*, in which a

psychiatrist failed to adequately control a patient. 100 Wn.2d at 424-25. In that case,

a psychiatrist discharged an involuntarily detained patient. The patient stopped taking

his medications and injured the plaintiff in a car accident five days after he was

released. *Id.* at 424. We found that this was a violation of the psychiatrist's duty to

control the patient, as the psychiatrist chose to release the patient rather than seeking

additional involuntary confinement. This fits with our analysis above—the injury to

the plaintiff was a foreseeable consequence of the failure to *control* the patient.[4]

Thus, the psychiatrist could be liable for that failure to control the patient, even

though the injuries to the victim occurred after the duty ended.

Second, a jail could theoretically be liable for injuries caused by former

inmates under a separate section of the *Restatement* that explains,

> An act or an omission may be negligent if the actor realizes or should realize
> that it involves an unreasonable risk of harm to another through the conduct of
> the other or a third person which is intended to cause harm, even though such
> conduct is criminal.

---

[4] The dissent contends that we focus solely on "physical control" and that any other action, such as transferring Zamora's files to his new jail, was "categorically" outside of Skagit County's § 319 duty. Dissent at 11. This is incorrect. Section 319 requires that jails "exercise reasonable care to control the third person to prevent him from doing such harm." A variety of actions might be needed to control a person to prevent him or her from doing harm, and there is nothing in § 319 or this majority that limits that duty to physical control. However, there is a limit on the jail's responsibilities under § 319; unfortunately, the dissent ignores that limit. By § 319's language, jails have a duty to exercise reasonable care *to control* a person so as to prevent them from doing harm. We do not change that limit today; we simply abide by it.

11

RESTATEMENT (SECOND) OF TORTS § 302B (AM. LAW INST. 1965). We have held that "*Restatement* § 302B may create an independent duty to protect against the criminal acts of a third party where the actor's own affirmative act creates or exposes another to the recognizable high degree of risk of harm." *Robb v. City of Seattle*, 176 Wn.2d 427, 429-30, 295 P.3d 212 (2013). While the trial court held that the jail's alleged actions in this case do not rise to that standard,[5] we nonetheless recognize that § 302B presents the possibility that a jail could be liable for a former inmate's actions in cases where an affirmative act has occurred.

Because we find that Skagit County had no duty to the plaintiffs, we do not reach the issue of whether its actions in April and May 2008 were the proximate cause of Zamora's psychotic break in September 2008.

## CONCLUSION

We affirm the trial court's grant of summary judgment to Skagit County. Jails have a responsibility to control violent inmates while they are incarcerated, but they do not have a general duty to prevent such inmates from committing crimes after they are lawfully released from incarceration.

---

[5] The trial court dismissed the plaintiffs' § 302B claim because the jail in this case did not commit an affirmative act, and the Court of Appeals affirmed. To the extent that respondents contend they raised this issue in their answer to the petition for review, we note that we granted only the petition for review; therefore, the § 302B claim is not before us.

_____
Owens, J.

WE CONCUR:

_Madsen, C.J._____    _Wiggins, J._____

_Fairhurst.J._____    _González, McCloud, Jr._____

_____    _____

No. 91644-6

YU, J. (dissenting) — The issue presented is not whether counties should be subject to an expansive duty to prevent recidivism by former jail inmates. Rather, the issue presented is whether the evidence in the record is sufficient to create a factual question about whether Skagit County fulfilled its duty to protect third parties from foreseeable violence by pretrial detainees and jail inmates in accordance with *Restatement (Second) of Torts* § 319 (Am. Law Inst. 1965) (§ 319). The majority limits the scope of this duty to maintaining physical control over the detainee or inmate during periods of lawful confinement, categorically excluding any other types of reasonable precautions a county might take. Such a limitation is inconsistent with our precedent, and the evidence in the record is sufficient to raise factual questions that should have precluded summary judgment. I would therefore affirm the Court of Appeals, and must respectfully dissent.

1

## FACTUAL BACKGROUND

Because the duty imposed by § 319 requires a highly fact-specific inquiry, I present these additional facts to supplement the factual summary in the majority opinion. And as the nonmoving parties at the summary judgment stage, the plaintiffs are entitled to have "all facts submitted and all reasonable inferences therefrom" viewed in the light most favorable to them. *Taggart v. State*, 118 Wn.2d 195, 199, 822 P.2d 243 (1992).

The records from Skagit County's own jail and sheriff's office indicate that Skagit County had known for years that Isaac Zamora suffered from mental health issues. *See* Clerk's Papers (CP) at 3551 ("At this time *we are aware that ISAAC ZAMORA does have some mental problems* and his mom will be monitoring him, calling if there is any change." (emphasis added)). The events surrounding Zamora's incarceration in Skagit County Jail in the spring of 2008 reaffirmed this knowledge, and also strongly indicated that his condition was worsening and becoming potentially dangerous.

On April 4, 2008, Skagit Emergency Communications Center received a hang-up call from the Zamora residence and dispatched Skagit County deputies to investigate. Zamora explained that he had called 911 and "just wanted to thank us and the dispatcher for a response the other day." *Id.* at 3554. The deputies arrested Zamora on two outstanding warrants and described him in their reports as

2

"verbally abusive" and "rambling." *Id.* At the request of jail staff, Zamora was taken to a hospital to determine whether "he was fit for jail" at all. *Id.* Zamora was ultimately housed in the "C-Pod" unit of Skagit County Jail, which is "sort of protective custody" for inmates who are "anti-social," who are "fearful" of others, are "disruptive" or "threatening" to the general population, or suffer from mental illness. *Id.* at 2581.

By this time, Zamora's mother was very concerned about his deteriorating mental health. Three days after Zamora was taken to jail, she wrote a letter to the Skagit County prosecutor, requesting that his sentence include "a mental health evaluation and treatment." *Id.* at 142. She also spoke to a Skagit County corrections officer by phone that day, reporting that she was "afraid" of Zamora due to his mental illness and unpredictable behavior. *Id.* at 2580. Zamora's mother reported he was "bi-polar and is aggressive [and] has anger problems," and "begged" the officer to keep Zamora in jail and get him mental health treatment. *Id.* at 3681. The next day, a mental health counselor asked Zamora if he would like contact with a mental health provider, but he would not answer the question at that time. *Id.* at 3683.

However, while Zamora was in Skagit County Jail, he did make three separate requests for mental health care. The first mental health counselor Zamora spoke with described him as having "[p]ersecutorial thoughts," being "easily

moved into rageful thinking," having "pressured speech," feeling "victimized," having "[s]ome grandiosity" about "his role in the world," and suffering from "anxiety" that "sounds like [a] panic attack." *Id.* at 3685. The counselor concluded, "He needs something!" *Id.* However, because Zamora was "paranoid about poison and not messing [with] his brain," the counselor entreated, "Can a person in medical please meet with him if meds are approved and address his fears?" *Id.* Three days later, a physician approved a prescription for Lamictal, an antiseizure medication that is often used as a mood stabilizer. There is no indication that anyone followed up on the counselor's urgent request that a medical professional meet with Zamora regarding this medication.

Zamora later spoke with a different mental health counselor and stated he was taking his Lamictal, although the medication log indicated he was refusing it. *Id.* at 3687. Zamora also told the counselor that he would take medication to help him sleep, but not any other "'mental' medications." *Id.* He "expressed extreme anger" regarding his mother's efforts to get him mental health treatment and asked the counselor to call his mother and "tell her to 'get the fuck out of my life.'" *Id.* The counselor noted he "appeared upset, [was] easily angered," and had "rambling style speech." *Id.* The counselor's recommendation was to "continue to offer psych meds." *Id.*

4

After Zamora had spent a little over a month in Skagit County Jail, he made a third mental health request, stating, "[I']d like [t]o talk because [I] keep seeing black dots and white flashes." *Id.* at 2958. Unlike Zamora's previous mental health requests, there are no notes indicating whether there was any follow up on this third request.

On May 15, 2008, after spending approximately 6 weeks in Skagit County Jail as a pretrial detainee, Zamora pleaded guilty to one count of malicious mischief in the second degree and one count of possession of a controlled substance. *Id.* at 3483, 3494. He was sentenced to 6 months of confinement, which, "if medically appropriate/required," could be served as in-home detention. *Id.* at 3498. Following confinement, Zamora was to serve 12 months of community supervision with conditions including "mental health eval[uation]/treatment," a "drug evaluation," and to "comply with all treatment recommendations." *Id.* at 3499. Two weeks later, Zamora was transferred to Okanogan County Corrections Center pursuant to an interlocal agreement. However, Skagit County transferred only part of Zamora's file, and did not provide Okanogan County with his judgment and sentence or other information about Zamora's mental health care needs. *Id.* at 2540, 2618. Zamora remained in Okanogan County Corrections Center for approximately 2 months.

5

Three days after Zamora was released, his mother called 911 because Zamora "was aggressive and angry towards his mother and brother." *Id.* at 2858. The responding deputy discovered Zamora had an outstanding warrant, arrested him, and took him back to Skagit County Jail. Zamora's mother told officers that he was "suffering from undiagnosed and untreated mental illness and that he has been a problem for some time." *Id.* at 3557. The deputy who brought Zamora to the jail specifically asked them not to release Zamora the same day in order to give his mother time to seek a no-contact order. Zamora was released the next day on his own recognizance.

About a month later, one of Zamora's neighbors, Clinton Griffith, called police to report Zamora had confronted Griffith's wife, demanding to know how long she had been living there. As Zamora left, he apparently tore down a sign on Griffith's gate. Griffith was less concerned about the property damage than about Zamora's "weird behavior" and the possibility that he was suffering from "some sort of mental illness." *Id.* at 3562. On that same day, Zamora underwent a mental health evaluation to determine his eligibility for services from the Department of Social and Health Services. Zamora "apparently really needed help," *id.* at 162, and the evaluator found him qualified for services. Zamora's mother viewed this evaluation as a "glimmer of hope" because in the preceding weeks he'd "been

progressively getting more seriously mentally ill with no treatment, no diagnosis, no help in sight." *Id.* at 181.

The violence underlying this lawsuit occurred the next day. Another of Zamora's neighbors, Chester Rose, called Zamora's mother to say Zamora was in Rose's house and "didn't seem to be himself." *Id.* at 170. Zamora apparently let himself into Rose's house, then demanded to know what Rose was doing there. Zamora's mother told Rose to call the police, which he did, and Skagit County Sheriff's Deputy Anne Jackson responded. Upon getting out of her patrol car at Rose's house, Deputy Jackson encountered Zamora and the two exchanged gunfire. Deputy Jackson was shot six times and died at the scene. In the ensuing melee, five of Zamora's neighbors were also killed and four more were injured.

## ANALYSIS

As correctly noted by the majority, the duty contemplated by § 319 stems from the special relationship that arises where one "takes charge" of someone else who has a known likelihood of harming others if not controlled. However, the majority incorrectly seizes on the single word "control" to unduly limit the scope of that duty. This interpretation is inconsistent with our precedent. It also encourages counties to detain individuals with known mental health issues in jail without making reasonable efforts to provide them with adequate treatment, to transfer such individuals to another county without providing adequate information

7

about their mental health needs, and to release such individuals into the community with more severe mental health problems than they had to begin with. We should not tolerate, much less encourage, such practices, which contribute to a revolving door, conveyor belt system of justice.

A.     Scope of the duty to control

The majority's analysis rests on a single word: "control." From this single word, the majority concludes that so long as Skagit County maintained physical control over Zamora while he was lawfully in custody, Skagit County fully discharged its § 319 duty. However, the scope of § 319 duty to control depends on the nature of the specific relationship at issue; it is not strictly limited to physical control.

Indeed, the very first case in which this court adopted § 319 applied it to the relationship between the State and parolees under its supervision. *Taggart*, 118 Wn.2d at 219. A parolee, by definition, is *not* within the State's immediate physical control, and we specifically rejected the argument that the duty imposed by § 319 is limited to custodial relationships involving physical control over a person. *Id.* at 223. Nevertheless, we held "that the State has a duty to *take reasonable precautions* to protect against reasonably foreseeable dangers posed by the dangerous propensities of parolees," *id.* at 217 (emphasis added), and we evaluated the scope of those reasonable precautions in light of the actual scope of

8

the State's authority over parolees, *id.* at 219-20. Our subsequent case law has adhered to this approach of evaluating the actual relationship giving rise to a § 319 duty to determine its proper scope. *See, e.g., Osborn v. Mason County*, 157 Wn.2d 18, 24, 134 P.3d 197 (2006); *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 320 n.3, 119 P.3d 825 (2005). In light of this precedent, it seems anomalous to hold, as the majority appears to, that § 319 imposes only a limited duty on counties to maintain physical control over its jail population, even though it imposes a broader duty on a state parole officer to take reasonable precautions to prevent foreseeable violence by parolees in the community.

There are, without question, important limitations on a county's authority to control its jail population. Of course, the only acts or omissions that Skagit County could be held liable for are those that occurred during its special relationship with Zamora while he was in custody. *See, e.g., Joyce*, 155 Wn.2d at 319; *Smith v. Dep't of Corr.*, 189 Wn. App. 839, 849-50, 359 P.3d 867 (2015), *review denied*, 185 Wn.2d 1004, 366 P.3d 1244 (2016).[1] There are also statutory, common law, and constitutional limitations on a county's authority that necessarily limit the

---

[1] In *Smith*, Division Two of the Court of Appeals held that the Department of Corrections' (DOC) take charge duty with respect to an offender on community custody "ended when [the offender] absconded from community custody and a warrant issued for his arrest." *Smith*, 189 Wn. App. at 848. However, it separately analyzed DOC's actions that occurred *before* the offender absconded, ultimately holding that any such actions or omissions did not proximately cause the victim's murder, which occurred almost four months later. *Id.* at 850-53.

9

scope of its duty. *See Osborn*, 157 Wn.2d at 24-25; *Joyce*, 155 Wn.2d at 320 n.3;

*Couch v. Dep't of Corr.*, 113 Wn. App. 556, 571, 54 P.3d 197 (2002). For

instance, as amicus rightly notes, Skagit County cannot be held liable for failing to

involuntarily medicate or civilly commit Zamora if it did not have the

constitutional and statutory authority to do so. *See* Br. of Amicus Curiae Am. Civil

Liberties Union of Wash. at 5-8.

It must also be emphasized that in this context, as in all negligence cases,

"only *reasonable* care is owed." *Lowman v. Wilbur*, 178 Wn.2d 165, 170, 309

P.3d 387 (2013). The law does not demand perfect results, but merely reasonable

efforts. For example, while Skagit County had the duty to provide Zamora with

necessary medical treatment, including mental health care, while he was in

custody, it had no overarching duty to completely rehabilitate Zamora or somehow

cure his mental illness. *See* RCW 70.48.130(1); *Gregoire v. City of Oak Harbor*,

170 Wn.2d 628, 635-36, 244 P.3d 924 (2010) (Sanders, J., lead opinion); *id.* at 646

(Madsen, C.J., concurring/dissenting); *cf. Melville v. State*, 115 Wn.2d 34, 38-39,

793 P.2d 952 (1990) (holding that general statutes do not impose a specific duty on

the Department of Corrections to provide a particular course of mental health care

treatment).

The record here indicates several reasonable precautions that might have

been within the scope of Skagit County's § 319 duty. Skagit County's own mental

health counselor recommended a reasonable step that Skagit County could have taken—having a medical doctor try to talk to Zamora about psychiatric medication. CP at 3685. While a doctor approved a prescription for Lamictal, it is not clear whether any doctor ever met with Zamora to address his fears or to evaluate whether Lamictal was an appropriate medication in light of Zamora's known symptoms and barriers to treatment. *Id.* at 2539-40, 2544-45. Moreover, § 319 unquestionably imposes "a duty to protect foreseeable victims of criminals, mental patients, and others *leaving* its custody." *Osborn*, 157 Wn.2d at 24 (emphasis added). But when Zamora was transferred to Okanogan County Corrections Center, Skagit County provided only part of his file and no information on his mental health care needs, potentially curtailing Okanogan County's ability to address those needs. CP at 2540, 2618. Under the majority's reasoning, however, even the basic step of transferring Zamora's file along with his person was categorically outside Skagit County's § 319 duty. This cannot be a legitimate limit on Skagit County's duty.

The majority rightly acknowledges that "[a] variety of actions might be needed to control a person to prevent him or her from doing harm." Majority at 11 n.4. However, this acknowledgment is inconsistent with the majority's apparent conclusion that such actions do not include reasonably following up on available information and conveying that information to other responsible parties. Those are

11

in fact *precisely* the type of actions that may be required to fulfill a § 319 duty because the ability to meaningfully control a foreseeably violent person necessarily requires adequate information about that person. *See, e.g., Joyce*, 155 Wn.2d at 316-17 ("[A] jury could conclude that this duty was breached by the State's failure to report egregious violations of the conditions of release to the court so that the trial judge could take action appropriate to the offender's conduct."); *Taggart*, 118 Wn.2d at 214 (parole officer allegedly failed to "provide his superior with relevant information necessary to enable the superior to make an informed decision whether to issue a parole warrant"). The majority does not explain why this case must be different, but nevertheless shifts the focus of its inquiry to whether Skagit County maintained basic, physical control over Zamora while he was in custody.

By focusing only on physical control, the majority's analysis treats the special relationship between a county and its jail population as analogous to the relationship between a warehouse and its inventory. This is unacceptable as applied to anyone, but is particularly disconcerting as applied to a presumptively innocent pretrial detainee who is known to be suffering from mental illness, as Zamora was for most of the time he was in Skagit County Jail. I therefore cannot join the majority.

B.     Foreseeability and proximate cause

Because the majority does not need to reach the other issues raised, I address

them only briefly.  I would affirm the Court of Appeals holding that there are

material factual questions precluding summary judgment dismissal of the

plaintiffs' § 319 claim.

First, Skagit County argues that it did not owe any take charge duty to the

victims because their injuries and deaths occurred after Zamora left its custody.  As

the Court of Appeals correctly determined, "this argument confuses the existence

of a duty with the scope of the duty." *Binschus v. Dep't of Corr.*, 186 Wn. App.

77, 95, 345 P.3d 818, *review granted*, 184 Wn.2d 1001, 357 P.3d 665 (2015).

Section 319 itself plainly contemplates that the duty extends to anyone who is

foreseeably injured by a breach occurring during the take charge relationship, even

if the injury occurs later.  Most on point is the first illustration:

> A operates a private hospital for contagious diseases.  Through the
> negligence of the medical staff[,] B, who is suffering from scarlet
> fever, is permitted to leave the hospital with the assurance that he is
> entirely recovered, although his disease is still in an infectious
> stage. . . . B . . . communicate[s] the scarlet fever . . . to D . . . . A is
> subject to liability to D.

RESTATEMENT (SECOND) OF TORTS § 319 cmt. a, illus.1 (AM. LAW. INST. 1965).  In

this illustration, A's take charge relationship with B ended when B was permitted

to leave the hospital. However, A's negligence *during* its take charge relationship with B foreseeably caused D's later injury, so A is liable.

Our case law is consistent with this analysis. Most on point is *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983).[2] In *Petersen*, a psychiatric patient had a schizophrenic-type reaction to drugs and the psychiatrist determined that the patient's symptoms were likely to return if the patient used drugs again or went off his medication. *Id.* at 428. The psychiatrist also determined that the patient was "quite likely" to resume taking drugs and stop taking his medication if released, but the psychiatrist did not seek additional involuntary commitment or "take other reasonable precautions." *Id.* The patient was released, resumed using drugs, and injured another person in a car accident while under the influence. *Id.* at 422-23. This court held that even though the car accident occurred after the psychiatrist's relationship with the patient ended, the psychiatrist might be liable for the injuries because the breach occurred during the relationship. *Id.* at 428.

Once a special relationship giving rise to a § 319 duty is established, the question of whether the actual injuries suffered by the particular victims were foreseeable is a question of fact "and should not be decided as a matter of law

---

[2] *Petersen* discusses the general special relationships contemplated by *Restatement (Second) of Torts* § 315 (Am. Law Inst. 1965), rather than the specific take charge relationship contemplated by § 319. However, it illustrates well that a victim can be foreseeable even if he or she does not suffer injury until after the special relationship ends.

unless reasonable minds could not differ." *Joyce*, 155 Wn.2d at 321 n.3; *see also*

*Taggart*, 118 Wn.2d at 224-25. Here, reasonable minds could differ. Zamora's

release into the community was not only foreseeable, but certain. And the victims

were Zamora's neighbors, members of the immediate community into which

Skagit County knew he would be released. Whether Zamora's acts of violence

against them were foreseeable should be resolved by the trier of fact.

Additionally, Skagit County contends that proximate cause is precluded as a

matter of law. "Washington 'recognizes two elements to proximate cause: [c]ause

in fact and legal causation.'" *Lowman*, 178 Wn.2d at 169 (alteration in original)

(quoting *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985)). While

proximate cause does present a close question in this case, I would hold it cannot

be resolved as a matter of law based on the record presented.

As to cause in fact, Skagit County contends that there is no evidence that

Zamora would have consented to any additional mental health care measures or

that any such measures would have been effective. However, the evidence in the

record indicates that Zamora's willingness to accept mental health care

fluctuated—he did in fact specifically request mental health treatment on three

separate occasions while in Skagit County Jail. CP at 2958, 3685, 3687. Zamora's

intermittent refusal to participate in mental health treatment cannot be treated as

definitive proof that he would certainly have refused all treatment if, for instance, a

15

medical professional had spoken to him as Skagit County Jail's mental health counselor had requested. *Id.* at 3685. Moreover, the record indicates that after the shootings, Zamora was confined at Western State Hospital and took medications that did in fact control his psychotic symptoms. *Id.* at 2545. This is significantly more concrete evidence than what we have rejected in the past as overly speculative. *See, e.g., Melville*, 115 Wn.2d at 40-41.

As to legal causation, Skagit County contends that the chain of causation was broken as a matter of law. However, in the specific context of a duty imposed by a special relationship, we have already held that "[t]he question of legal causation is so intertwined with the question of duty that the former can be answered by addressing the latter." *Taggart*, 118 Wn.2d at 226; *see also Hertog v. City of Seattle*, 138 Wn.2d 265, 284, 979 P.2d 400 (1999). And Skagit County does not point to "an actual intervening act" in the record that was sufficient to break the chain of causation. *Joyce*, 155 Wn.2d at 321-22; *see, e.g., Bishop v. Miche*, 137 Wn.2d 518, 531-32, 973 P.2d 465 (1999) (where probation officer reported a violation of court-imposed probation conditions and the court chose not to revoke probation, the court's decision precluded proximate cause as a matter of law). I would therefore hold that summary judgment on the issue of proximate cause was not appropriate.

16

## CONCLUSION

I cannot join the majority's narrow interpretation of the duty imposed by

§ 319. And because the evidence, viewed in the light most favorable to the

plaintiffs, is sufficient to create genuine issues of material fact on all the elements

of their § 319 claim, I would affirm the Court of Appeals and remand for further

proceedings. I respectfully dissent.

_____

Yu, J.

Stephen J.
Johnson

González, J.