# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ANTHONY SMITH and JULIE SMITH, a marital community; and ANTHONY SMITH as personal representative of the ESTATE OF MEAGAN SMITH,<br><br>Appellants,<br><br>v.<br><br>WASHINGTON STATE DEPARTMENT OF CORRECTIONS; and AMERICAN BEHAVIORAL HEALTH SYSTEMS, INC., a Washington corporation,<br><br>Respondents. | No. 81246-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — The Smiths appeal from two orders granting summary judgment for American Behavioral Health Systems and the Department of Corrections. They argue material issues of fact existed as to whether ABHS and the DOC breached a duty of care owed to their daughter, Meagan. We affirm.

## FACTS

On September 8, 2014, Zachary Craven attacked his grandmother, Angelika Hayden. He demanded she drive him to the hospital to obtain pain medication, threatening to "'slit her throat'" and twice jerked the steering while she drove. At that time, Craven was under Washington State Department of Corrections (DOC) supervision for previous crimes against Hayden and others. The new offense did not violate the conditions of his DOC supervision. By

September 30, 2014, the DOC reported that Craven had been released from custody. On December 26, 2014, the DOC closed Craven's supervision on the prior offenses.

Craven was arrested and pleaded guilty to felony harassment – domestic violence and theft in the first degree – domestic violence. The court ordered a presentence examination to determine his eligibility for a residential drug offender sentencing alternative (DOSA). The DOSA statute provides that a court may sentence an eligible offender into community custody in lieu of serving their sentence in prison. RCW 9.94A.660(3). The DOC supervises offenders sentenced to community custody. RCW 9.94A.030(21); .501(1), (4)(f). The DOC contracts with American Behavioral Health Systems, Inc. (ABHS) to provide residential services for DOSA offenders.

On June 26, 2015, the court sentenced Craven to a residential treatment program under DOSA. The record indicates Craven was not in custody prior to his sentencing hearing. The DOSA sentence provided that Craven would serve 24 months in community custody under the supervision of the DOC, on the condition that he enter and remain in residential chemical dependency treatment for 3-6 months. It further provided that pending DOC placement in a residential treatment program, Craven was to report to a DOC day reporting center within 24 hours of release. The trial court was unaware that the DOC shut down all day reporting centers around 2008.[1]

[1] The DOC advocated to revise the law so that offenders can be detained between their sentencing date and their treatment dates. These efforts were ultimately successful, but the statutory revisions granting such authority to the

Craven's ABHS admittance date was scheduled for July 1, 2015. ABHS scheduled transportation for Craven to its treatment center for July 1, 2015. He did not show up on July 1, 2015 for transport to ABHS. ABHS reported to the DOC on July 2 that Craven failed to report for transport to treatment.

In King County, the DOC had a practice of picking up hard copies of judgments and sentences from the courts on Tuesdays and Thursdays.[2] After Craven's sentencing, his judgment and sentence was retrieved by the DOC on either the following Tuesday, June 30, 2015, or the following Thursday, July 2, 2015. Office Support Supervisor Della Callaghan reviewed it on Thursday, July 2, 2015. Court and state offices were closed on Friday, July 3, 2015 ahead of Independence Day. Callaghan sent Craven's judgment and sentence to the Kent field office on Monday, July 6, 2015 via campus mail. It was received by Community Corrections Officer (CCO) Wayne Derouin on Wednesday, July 8, 2015. Derouin was assigned to Craven that day.

---

sentencing court were not effective until January 1, 2021. LAWS OF 2020, ch. 252, §§ 3, 5 (revising RCW 9.94A.664).

[2] In her declaration DOC Officer Support Supervisor Della Callaghan, stated that King County Superior Court required DOC staff to physically retrieve judgment and sentences on only Tuesdays and Thursdays. There were typically 100 to 150 judgment and sentences each week. A manager in the King County Superior Court Clerk's office, David Smith, said that the judgment and sentence in this case was publically available when it was uploaded electronically on June 29, 2015. He stated that he was unaware of any requirement for retrieval of physical copies of judgment and sentences by the DOC on any particular day of the week. The copy of the judgment and sentence in the record has a handwritten note stating "scanned 7/8." It is unclear who wrote this note.

That same day, Craven was arrested on suspicion of murder. Between his sentencing hearing and July 8, 2015, Craven had not reported for supervision at any DOC facility.

On July 1, 2015, instead of reporting to supervision, Craven assaulted his grandfather, Bob Luxton. Luxton reported the assault the next day. On July 5, 2015, Craven violated a no-contact order by going to Hayden's home. Hayden reported the incident the next day.

On July 7, 2015, Luxton discovered Hayden deceased in her home. That same day, Theresa Cunningham and her family returned from a trip to find their house sitter, Meagan Smith, murdered in their kitchen. Cunningham was Craven's ex-girlfriend. She had broken up with Craven in June 2015 after his behavior became controlling and violent, but the record does not indicate that she reported the abuse to police. Craven contacted Cunningham while she was being interviewed by police. He asked her to pick him up at a nearby Walgreens store, where he was subsequently arrested by police.

On July 3, 2018, Meagan Smith's parents, Anthony and Julie Smith (the Smiths), brought suit against the DOC and ABHS. Their amended complaint sought judgments against the defendants for wrongful death. Both defendants moved for summary judgment, which the trial court granted.

The Smiths appeal.

4

DISCUSSION

The Smiths allege material issues of fact existed as to whether ABHS and the DOC breached a duty of care owed to their daughter, Meagan.[3]  First, they argue ABHS and the DOC had a duty to supervise Craven at the time of Meagan's death.  Next, they argue material issues of fact exist as to whether that duty was breached.  Finally, they argue material issues of fact exist as to whether the DOC's alleged negligence proximately caused their daughter's death.

We review a trial court's grant of summary judgment de novo.  Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014).  Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  CR 56(c).  The court considers all facts and makes all reasonable factual inferences in the light most favorable to the nonmoving party.  Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

To make a prima facie case for negligence, a plaintiff has the burden to demonstrate a duty was owed, a breach of that duty, and injury to the plaintiff proximately caused by the breach.  Harper v. State, 192 Wn.2d 328, 340, 429 P.3d 1071 (2018).

I.  Duty of Care

The Smiths argue that the DOC and ABHS had a take charge relationship with Craven pursuant to the Restatement (Second) of Torts § 319 (Am. Law Inst. 1965) that commenced upon the signing of the judgment and sentence.  They

---

[3] We use Meagan's first name for clarity.  No disrespect is intended.

argue a duty arose under either § 315 or § 302B of the Restatement, as adopted by Washington courts.

Existence of a duty is a question of law. Schooley v. Pinch's Deli Market, Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998). Questions of law are reviewed de novo. Sherman v. State, 128 Wn.2d 164, 183, 905 P.2d 355 (1995).

A. The DOC

Generally, the DOC is not responsible for preventing criminal defendants from harming others absent a special relationship. Harper, 192 Wn.2d at 341. Our Supreme Court has found that a special relationship can arise where the DOC "'takes charge of a third person whom [it] knows or should know to be likely to cause bodily harm to others if not controlled.'" Taggart v. State, 118 Wn.2d 195, 219, 822 P.2d 243 (1992) (quoting RESTATEMENT § 319). Under § 319, the take charge relationship creates a duty to protect others from reasonably foreseeable dangers engendered by supervised offenders' dangerous conduct. Id. at 224. In Joyce, the court held that CCOs assume a duty to take reasonable care in supervising an offender's conduct by taking steps to ensure that the offender complies with all conditions of release. Joyce v. State, 155 Wn.2d 306, 316, 119 P.3d 825 (2005).

The Smiths argue the DOC breached its duty with the assumption that because Craven was supposed to come into its care, such a duty had in fact attached. They argue the duty attached when the judgment and sentence was issued. But, as a threshold matter, they must demonstrate the defendant had a

definite, established, and continuing relationship with the offender it failed to supervise. Binschus v. State, 186 Wn.2d 573, 579, 380 P.3d 468 (2016).

The Smiths rely on Bordon, where the court held the duty to control the offender's behavior was not affected by the fact that it never received the judgment and sentence. Estate of Bordon ex rel. Anderson v. State, 122 Wn. App. 227, 236, 95 P.3d 764 (2004). But, unlike Craven, the offender in Bordon was already under active supervision. Id. at 231. There was evidence within the DOC's active file on the offender showing the supervising CCO should have known the offender had recently been convicted of an eluding charge, and supervised him accordingly. Id. at 237. Here, at the time of the incident, there was no active CCO file on Craven. And, no supervising CCO had been assigned to review such a file.

Other leading Washington cases involving take charge relationships under Restatement § 319 all involved supervision where a CCO or parole officer had been assigned and had engaged in contact and supervision of the offender. See Taggart, 118 Wn.2d at 198; Joyce, 155 Wn.2d at 316-17; Estate of Davis v. State, 127 Wn. App. 833, 842, 113 P.3d 487 (2005). None of those cases addressed the question of the existence of a take charge relationship prior to the assignment of a supervisor.

For example, in Taggart, the plaintiffs raised claims against the State and its agents for negligent parole supervision after being injured by parolees in separate assaults. 118 Wn.2d at 198. The court recognized the existence of a take charge relationship between parole officers and the parolees they supervise.

Id. at 220. In both instances, the parolee had already been assigned a parole officer. Id. at 200-01,

In Joyce, the court concluded a jury could find that a Restatement § 319 duty had been breached by the State's failure to report egregious violations of the conditions of release to the court. 155 Wn.2d at 316-17. At the time of the alleged negligent supervision, supervisee Stewart had already been assigned a CCO. Id. at 310. Whether the duty existed prior to this assignment was not before the court.

Davis likewise involved an offender who had already been assigned a CCO. 127 Wn. App. at 842. The court held a CCO "cannot take charge without a court order, and he can enforce the order only according to its terms and controlling statutes." Id. There is no suggestion in Davis or any other case provided by the Smiths that the DOC has a duty or relationship or is expected to enforce an order before it has actual notice of the content of the order.

And, the DOC carries out its supervisory duties through its CCOs. See RCW 9.94A.704(3)(a). Until a CCO is appointed, there is no one to establish a relationship with the offender. Here, Craven was not under supervision when he killed Meagan. The DOC received a copy of the order on June 30 or July 2. A CCO was appointed on July 8. Meagan was found dead on July 7, before the CCO was appointed. On these facts, a definite supervisory relationship between a CCO and Craven did not exist at that point in time.[4]

---

[4] The Smiths do not argue that the controlling statutes support the assertion that a duty attaches when the judgment and sentence is issued. The statute assigning supervision of DOSA offenders to the DOC does not provide when DOC supervision begins or when such a duty attaches. See RCW 9.94A.501(5), (7). The Smiths have not directly challenged the DOSA statute.

The authority relied on by the Smiths does not support their assertion that a take charge duty and relationship is necessarily created as of the issuance of a judgment and sentence. The Smiths have not established as a matter of law the existence of a take charge relationship between the DOC and Craven.

Next, the Smiths assert two alternate theories under which a duty existed. First, they argue the DOC had a special relationship with Craven under Restatement § 315, as adopted by Washington courts. Similar to Restatement § 319, a duty will be imposed under § 315 only where there is a "'definite, established and continuing relationship between the defendant and the third party.'" Hertog, ex rel. S.A.H. v. City of Seattle, 138 Wn.2d 265, 276, 979 P.2d 400 (1999) (quoting Taggart, 118 Wn.2d at 219). The Smiths argue the DOC's previous supervision of Craven gave it unique insight into his dangerous propensities, giving rise to a duty. But, the DOC owes a duty to those who are injured during an offender's active supervision, not after it ends. Hungerford v. State, 135 Wn. App. 240, 258, 139 P.3d 1131 (2006). The DOC is not liable for future crimes of previously supervised offenders.

The Smiths still must establish a continuing relationship with Craven, which they have failed to do here. They rely primarily on Volk v. DeMeerleer, which

---

Further, DOC policy provided that a CCO must be assigned to supervise an offender within 5 working days of receipt of the offender's judgment and sentence. Under DOC Policy 310.100, the CCO then has 30 days to conduct an intake. DOC Policy 380.200 requires CCOs to verify the offender's address within 10 days of the assignment. The Smiths do not allege that CCO Derouin failed to follow DOC policies. As such, there would need to be evidence that the DOC policy was failing to supervise offenders at an institutional level by allowing the assignment and supervision to begin within 5 days of receipt. But, the Smiths also declined to challenge the DOC standards as negligent.

9

involved the victim of a man in outpatient treatment with a mental health provider. 187 Wn.2d 241, 386 P.3d 254 (2016). But, the patient and psychiatrist in Volk had a nine year relationship which was uncontested as "special" by both parties. Id. at 274. As discussed above, Craven's relationship with the DOC was not ongoing. The previous supervision had ended. The recently ordered supervision had not commenced when the crime was committed.

Next, the Smiths argue the DOC created a risk of harm to Meagan, owing her a duty under Restatement § 302B.

Section 302B imposes a duty where an "actor's own affirmative act has created . . . a recognizable high degree of risk of harm" to a third party. Robb v. City of Seattle, 176 Wn.2d 427, 434, 295 P.3d 212 (2013) (emphasis omitted) (quoting Restatement § 302B, comment e). Foreseeability alone is insufficient. Id. at 435. A failure to eliminate a danger is also insufficient. See id. at 436-38. An affirmative act that increases a danger is required. See id. at 429-30.

The Smiths again argue the DOC was aware of the dangers posed by Craven. They point to several actions, such as the alleged delay in appointing a CCO by the DOC. The DOC's actions described by the Smiths constitute acts of omission rather than commission.

The Smiths failed to identify issues of material fact as to whether a duty arose under any of these three theories. As a matter of law, they failed to establish a duty owed by the DOC to their daughter.

B. ABHS

The Smiths make the same arguments regarding the existence of a duty between Craven and ABHS. These arguments are even more tenuous in relation to ABHS, which had no prior relationship to Craven and never treated him.

First, they argue ABHS had a take charge duty under Restatement § 319. Because ABHS was under contract with the DOC to monitor offenders and restrict their movements, the Smiths argue it undertook the duty assumed by the DOC. They point to Hertog, where the court held that even if the entity lacks authority to arrest, a duty will arise once it has the responsibility of monitoring for compliance with the conditions of release. 138 Wn.2d at 276. Craven never reported to ABHS for transport to treatment. The record indicates Craven was not in custody prior to his sentencing hearing. The Smiths have not provided authority to demonstrate that ABHS had the responsibility to monitor Craven prior to him reporting to it or starting treatment. As ABHS notes, it lacks authority not just to arrest, but to even prevent a patient from leaving the facility once they are in treatment. The Smiths cite no case in which a facility such as ABHS has been found to have assumed a duty to a patient they have not yet had in person contact with, let alone treated. ABHS did not have a definite, established, and continuing relationship with Craven as contemplated by Restatement § 319. Binschus, 186 Wn.2d at 579.

Next, the Smiths argue ABHS had a special relationship with Craven under Restatement § 315. But, again, Craven never entered treatment at ABHS. No definite relationship was established and no duty commenced.

11

And, liability under Restatement § 302B must be based on affirmative actions. Robb, 176 Wn.2d at 434. The Smiths assert a breach of duty occurred when ABHS failed to adequately alert the DOC when Craven didn't report for transport, purchasing him a Greyhound bus ticket so he could report later that day. ABHS reported to DOC on July 2 that Craven failed to report for transport to treatment. The Smiths do not allege the only affirmative act taken by ABHS—purchasing the ticket to transport Craven to treatment—increased the danger of him harming others. They have not established any affirmative acts by ABHS necessary to create a duty to their daughter under this section or acts that could have been a breach of such duty.

The Smiths have failed to establish a material question of fact under any of their three theories that ABHS had assumed any duty to supervise Craven at the time of Meagan's death. As a matter of law, they failed to establish a duty owed by ABHS to their daughter.

## II. Proximate Causation

Even if a duty to supervise had existed between Craven and either the DOC or ABHS,[5] the Smiths have failed to provide evidence of proximate causation.

Proximate cause is composed of two distinct elements: (1) cause in fact and (2) legal causation. Fabrique v. Choice Hotels Int'l, Inc., 144 Wn. App. 675, 683, 183 P.3d 1118 (2008). Cause in fact refers to the "but for" consequences of an

---

[5] The Smiths argue whether Meagan would be alive today "but for" the DOC's failure to supervise Craven is a question of fact for the jury. They do not offer the same argument for ABHS. As such, we address the argument as briefed, regarding only the DOC.

act, or the physical connection between an act and the resulting injury. Id. The plaintiff must establish that the harm suffered would not have occurred but for an act or omission of the defendant. Joyce, 155 Wn.2d at 322. Legal causation rests on policy considerations as to how far the consequences of a defendant's acts should extend and involves a determination of whether liability should attach as a matter of law given the existence of cause in fact. Fabrique, 144 Wn. App. at 683. Both elements must be satisfied. Id.

Proximate cause may be determined as a matter of law only when reasonable minds could reach but one conclusion. See Kim v. Budget Rent A Car Sys., Inc., 143 Wn.2d 190, 203, 15 P.3d 1283 (2001).

The Smiths argue whether Meagan would have been killed "but for" the DOC's negligence is a question properly reserved for the jury. They assert the DOC received an e-mail that Craven did not report for treatment on July 2, and had the DOC attempted to locate Craven, they could have done so with ease. They point to the DOC's concession that it could have detained him even absent a bench warrant.[6]

The DOC counters the Smiths cannot prove proximate cause because they cannot demonstrate that but for its alleged gross negligence, the damages sustained by the plaintiff would have been avoided. The Smiths were required to

---

[6] In its motion for summary judgment, the DOC noted,
> CCO Derouin could also have sought to locate Craven and arrested [sic] him on a detainer, pending the DOSA Court's violation process, but there were no community reports that this was necessary, and there was no indication that Craven was actually staying with Mr. Luxton, the address provided on his [judgment and sentence], after Craven assaulted Mr. Luxton on July 1, 2015.

show that the offender would have been incarcerated on the date of the murder. Hungerford, 135 Wn. App. at 253 (affirming summary judgment when plaintiff presented "no evidence that [the offender] would have been in jail on the day of Hungerford-Trapp's murder had DOC acted differently").

The first notice that Craven was not complying with his judgment and sentence was received by the DOC on July 2, 2015. ABHS sent an e-mail to someone at the DOC indicating Craven had failed to report the day before. That same day, Luxton reported to police that he had been assaulted by Craven. Had the DOC begun investigating Craven's whereabouts, it had contact information and addresses for Luxton, with whom Craven was to be staying, and for Hayden, with whom he was to have no contact. It also had Cunningham's phone number which Craven had listed as a contact on his April 15, 2013 screening form.[7] The record provides information on what these people knew at the relevant times.

Craven assaulted Luxton on July 1. Luxton was not sure if Craven left that night. In the morning, Luxton left to stay at Hayden's. When he left, his Ford truck was parked in his driveway. Luxton contacted a neighbor, who he says told him the truck was gone and had been driven away by an unnamed male. Luxton asked police to report the truck missing, stating Craven did not have permission to drive

---

[7] The Smiths indicated below that CCO Derouin had been told on at least one occasion that Craven had been "aggressive toward the Cunningham family" during his supervision of Craven from 2013 to 2014. This citation appears to be to a DOC report indicating on October 7, 2014, while at Harborview Medical Center, Craven had "talked about his girlfriend's mom and his issues with her. . . . [H]e did not threaten her, but expressed anger towards her." The record does not indicate that the DOC had knowledge of the current relationship status of or abuse allegations between Cunningham and Craven. Cunningham had not reported any abuse by Craven to police.

it.  On July 3, 2015, a Kent police officer reported that he had driven by the house and the truck was still gone.  Police called Luxton on July 3, 2015 to get more information on the suspect.  Luxton did not answer and had not called the officer back by Tuesday, July 7, 2015.

On July 7, 2015, Luxton was interviewed by police at the scene of Hayden's murder.  He told police he had not seen Craven for about a week since the assault.  Luxton had last spoken to Hayden on July 7, 2015, at 11:30 a.m.  In the reports of their interview with Luxton, police do not make note of him mentioning any sighting of Craven by Hayden.

On July 6, 2015, Hayden reported to police that Craven had shown up at her house the previous day in violation of his no-contact order.  He stayed for five minutes to pick up some personal items.  She told police in a signed statement that she did not know where Craven was staying.

A suspicious vehicle had been spotted in the area by Hayden's neighbor on July 6, 2015.  Her neighbor saw a man walk down the alley towards her house, returning with trash bags filled with something.  He photographed the license plate number.  The driver of the truck was located after Hayden was found murdered.  The driver admitted to driving Craven as a favor to a mutual friend, Mike Garcia.  Garcia told police that Craven had stayed with him for a week or so, but that he had kicked him out within the past couple of days for bringing a pistol into the home.  Had the DOC spoken with him, the neighbor would have had nothing to report to the DOC prior to July 6.  There is nothing in the record to suggest the DOC knew of Garcia or that Craven was staying with him.  And, there is nothing to

suggest that an investigation into his whereabouts would have produced this information before July 7, the day Meagan was found murdered.

Had the DOC called Cunningham, they would either not have reached her at all or would have learned that she was out of town on vacation. When interviewed later she told police she had not seen Craven since June 24, 2015. She did not have a current phone number for Craven. He had destroyed his subscriber identity module (SIM) card around June 3, 2015 and did not have a working phone. Hayden left a voicemail message for Cunningham on July 1, 2015 asking if she had heard from Craven who was supposed to turn himself in that day and warning her "'if he comes around, do[ not] see him.'" Nothing in the record indicates whether Cunningham heard this message before returning from vacation, and as a result would have been able to relay the information to the DOC or to Meagan.

The evidence gathered in the murder investigation included the contacts and sources that were available in the DOC file. None of the information they had, or could have had based on the investigation, provided a location for Craven. Because nothing in the investigation supports a conclusion that action by the DOC would have resulted in Craven's incarceration before July 7, the jury would be left to speculate on causation in fact.

The DOC had no reason to know that Meagan would be housesitting for Cunningham or that Craven would visit the home while she was there. Assuming there was a duty of care to foreseeable victims, the Smiths have not demonstrated that Meagan was a foreseeable victim of Craven within the scope of that duty. On

this record, the connection between the DOC's alleged gross negligence and Meagan's death is considerably attenuated.

Speculation and argumentative assertions are not sufficient to create a genuine issue of material fact. <u>See</u> <u>Bordon</u>, 122 Wn. App. at 246-47. Absent further evidence, the Smiths' theories of proximate causation call for a jury to engage in speculation.

The evidence is insufficient to create an issue of material fact that the gross negligence by the DOC proximately caused Meagan's death.

We affirm.

_Appelwick, J._

WE CONCUR:

_Chun, J._